# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOE D'AMBROSIO,** | ) | **Case No. 1:11 CV 933** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **CARMEN MARINO et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

In 1988, Plaintiff Joe D'Ambrosio was convicted, along with Michael Keenan, of the

aggravated murder of Estel Anthony (Tony) Klann, sentenced to death, and incarcerated on

death row for nearly 21 years before his release in March 2010. Following two decades of

litigation, the Sixth Circuit Court of Appeals affirmed the district court's ruling that the

prosecution withheld a significant amount of exculpatory and impeachment evidence from

D'Ambrosio's criminal counsel in violation of his constitutional due-process rights under *Brady*

*v. Maryland,* 373 U.S. 83 (1963) (hereafter, "*Brady* violations"). The Sixth Circuit later

affirmed the district court's ruling barring his re-prosecution. D'Ambrosio now seeks monetary

compensation from two county prosecutors, the lead investigator, the City of Cleveland, and

Cuyahoga County for the years he was incarcerated as the result of his unconstitutionally

procured conviction.[1]

---

[1] D'Ambrosio's *Brady* claim against then-Cuyahoga County Coroner Dr. Elizabeth Balraj
has been dismissed. (Doc #: 48.) Moreover, D'Ambrosio concedes that the purported state-law
claim alleged against both Dr. Balraj and Detective Leo Allen in Count Four of the Second
Amended Complaint "is a defense and not an independent cause of action." (Doc #: 52, at 14.)
Therefore, **Count Four is dismissed with prejudice**.

Presently pending before the Court are:

1. Defendant Leo Allen's Motion for Judgment on the Pleadings (**Doc #: 52**)

2. Defendant City of Cleveland's Motion for Judgment on the Pleadings (**Doc #: 53**)

3. Defendants Marino, Mason, and Cuyahoga County's Consolidated Motion to Dismiss for Lack of Jurisdiction and for Judgment on the Pleadings (**Doc #: 51**)

For reasons discussed *infra*, the Motions are **GRANTED**, and the *Brady* claims brought against all Defendants are dismissed on the merits.

## I.

The Second Amended Complaint alleges the following substantive facts, which facts must be taken as true for purposes of the pending Motion. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

At some time between the evening of Thursday, September 22, 1988 and the morning of Saturday, September 24, 1988, Tony Klann was murdered. (See generally Doc #: 20, Second Amended Complaint ("SAC").) On Saturday afternoon, a jogger discovered Klann's body in Doan Creek, near Martin Luther King Boulevard in Cleveland, Ohio. Dr. Balraj, who conducted Klann's autopsy, determined that Klann suffered multiple stab wounds to his trunk and neck with multiple visceral perforations, and ruled Klann's death a homicide. On a trace evidence report, Dr. Balraj noted that Klann's body was received at the morgue in a T-shirt, pants and socks, with no shoes or undershorts. The Cleveland Police Department detectives who first arrived on the scene (Goldstein and Hayes) concluded that Klann had been killed elsewhere and his body dumped in the creek because there was no blood or other indication of a struggle near the body, and the lack of shoes suggested that the victim had not been out walking.

Two days after Klann's body was discovered, a man named Paul Lewis called police and, without identifying himself, asked if the victim's hands were cut – information not known to the public. He was directed to the morgue, where he identified Klann in the company of Cleveland Police Detective Leo Allen, who ultimately headed the murder investigation. Lewis later told police that he saw D'Ambrosio, Keenan, and a man named Eddie Espinoza at a bar called Coconut Joe's on Friday night, September 23, and that they were arguing with Klann. He told police that one friend (James Russell) later told him these three men stopped by Russell's apartment armed and looking for Lewis, whom they believed had stolen their drugs; and that another friend (Adam Flanik) told him he saw D'Ambrosio in Keenan's truck in the wee hours Saturday morning with a knife to Klann's throat. The police subsequently arrested Espinoza, D'Ambrosio, and Keenan, and charged them with the aggravated murder of Tony Klann.

Espinoza confirmed Lewis' story and told police that he witnessed D'Ambrosio and Keenan kill Klann. Espinoza said that D'Ambrosio and Keenan abducted Klann, whom they found walking along the road late Friday night, in order to force him to lead them to Lewis to recover the stolen drugs. Espinoza said they drove to Doan Creek where Keenan slashed Klann's throat because Klann would not say where Lewis was, and that D'Ambrosio chased Klann down and stabbed him in the chest to finish him off.

D'Ambrosio was tried by a three-judge panel. The trial turned on D'Ambrosio's testimony versus Espinoza's alleged eyewitness testimony. The panel convicted D'Ambrosio of Klann's murder, and sentenced him to death.

In March 2006, then-District Judge Kathleen O'Malley,[2] reviewing D'Ambrosio's federal habeas petition, issued an opinion concluding that the prosecution violated *Brady* by failing to disclose to D'Ambrosio's counsel, prior to trial, a significant amount of evidence the sum of which was favorable to D'Ambrosio. *D'Ambrosio v. Bagley* ("*D'Ambrosio I*"), No. 1:00 CV 2521, 2006 WL 1169926 (N.D. Ohio Mar. 24, 2006). Accordingly, Judge O'Malley granted D'Ambrosio's habeas petition with the following directions:

> The Respondent shall either: (1) set aside D'Ambrosio's conviction and sentence of death; or (2) conduct another trial. This shall be done within 180 days from the effective date of this Order. On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

*Id.* at *1. As directed, the 180-day period was stayed pending appeal.

On June 5, 2008, the Sixth Circuit Court of Appeals affirmed Judge O'Malley's ruling. *D'Ambrosio v. Bagley*, 527 F.3d 489 (6th Cir. 2008). On September 11, 2008, Judge O'Malley issued an order lifting the stay and ordering the State to again either set aside D'Ambrosio's conviction or retry him within 180 days.

In late February 2009, a little over one week before D'Ambrosio's retrial was scheduled to begin (March 2, 2009), the State produced additional, previously undisclosed, exculpatory evidence. The state trial court refused to proceed with D'Ambrosio's retrial until he had time to examine this new evidence. Thus, the State returned to federal court and asked Judge O'Malley for additional time to retry D'Ambrosio, notwithstanding her prior order that he be retried within 180 days. D'Ambrosio vigorously opposed the motion, and asked Judge O'Malley to grant the unconditional writ and bar his reprosecution.

---

[2]District Judge O'Malley has since been elevated to the Court of Appeals for the Federal Circuit.

On March 6, 2009, Judge O'Malley extended the 180-day deadline for the sole purpose of providing all parties full and fair opportunity to brief the question of whether, in light of the State's latest *Brady* violation, the Court should bar the reprosecution of D'Ambrosio.

On April 27, 2009, Judge O'Malley granted an unconditional writ of habeas corpus ordering D'Ambrosio released from custody and expunging his conviction. *D'Ambrosio v. Bagley* ("*D'Ambrosio II*"), 619 F. Supp. 2d 428, 460 (N.D. Ohio 2009). She denied the State's request for an extension of the 180-day period due to its lack of good-faith effort to comply with the lifting of the stay of the 180-day time period on September 11, 2008. *Id.* at 455. Although Judge O'Malley ordered D'Ambrosio's release, she did not bar his re-prosecution. *Id.* Rather, she stayed the issuance of the unconditional writ for fifteen days, allowing the State an opportunity to determine whether it wished to retry D'Ambrosio. *Id.* The State took no action during this 15-day period.

The day before Judge O'Malley issued *D'Ambrosio II*, the State's key witness, Edward Espinoza, died. The State learned of Espinoza's death on April 30, 2009, but failed to inform either D'Ambrosio or the state court of this news until late July, and never informed the district court of this fact.

On August 14, 2009, D'Ambrosio filed a motion asking Judge O'Malley to vacate her April 27, 2009 Order and to enter a new order barring reprosecution. On March 3, 2010, Judge O'Malley vacated part of her unconditional writ and barred the reprosecution of D'Ambrosio. *D'Ambrosio v. Bagley* ("*D'Ambrosio III*"), 688 F. Supp. 2d 709 (N.D. Ohio 2010).

On March 5, 2010, the state trial court dismissed all charges against D'Ambrosio, and ordered him released without any conditions.

On August 29, 2011, the Sixth Circuit affirmed Judge O'Malley's unconditional writ barring D'Ambrosio's reprosecution. *D'Ambrosio v. Bagley*, 656 F.3d 379 (6th Cir. 2011). On January 23, 2012, the Supreme Court denied the State's petition for a writ of certiorari. *Bobby v. D'Ambrosio*, 132 S.Ct. 1150 (2012).

Meanwhile, on May 10, 2011, D'Ambrosio filed the instant four-count complaint alleging *Brady* claims against the prosecutors and Cuyahoga County (Count One), against Detective Allen and the City of Cleveland (Count Two), and against Dr. Elizabeth Balraj and the County (Count Three); along with a state-law claim against Dr. Balraj and Detective Allen (Count Four). The Court has dismissed Count Three and Count Four. (See infra, at 1 n.1.) Thus, the only remaining claims are the *Brady* claim against Detective Allen and the City (Count Two), and the *Brady* claim against the prosecutors and the County (Count One). The moving Defendants now seek dismissal of those claims. The Court has reviewed the pending motions, the opposition and reply briefs, and the record and is prepared to issue the rulings.

## II.

Federal Rule of Civil Procedure 12(c) provides that once the pleadings are closed, any party may move for judgment on the pleadings. The standard for analyzing a motion for judgment on the pleadings under Rule 12(c) is the same standard applicable to motions to dismiss under Fed. R. Civ. P. 12(b)(6). *See, e.g., Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001); *Theiss v. Burger King Restaurant*, No. 5:11 CV 787, 2011 WL 2971099, at *1 (N.D. Ohio Jul. 20, 2011).

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. "The first step in testing the sufficiency of the complaint is to identify any conclusory allegations." *Doe v.*

*Simpson*, No. C-1-08-255, 2009 WL 2591682, at *1 (S.D. Ohio Aug. 19, 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "Threadbare recital of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Although the court must accept well-pleaded factual allegations of the complaint as true for purposes of a motion to dismiss, the court is 'not bound to accept as true a legal conclusion couched as a factual allegation.' "  *Simpson*, 2009 WL 2591682, at *1 (*quoting Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 566 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).  More is required than "unadorned, the-defendant-unlawfully-harmed me accusations."  *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

## III.

### A.    Statute of Limitations

As a threshold matter, all Defendants (individual, City, and County) contend this case, which was filed on May 10, 2011, is time-barred because D'Ambrosio failed to file suit before the two-year statute of limitations expired.[3]  Defendants argue that the § 1983 *Brady* claims accrued when Judge O'Malley issued her conditional writ on March 24, 2006, because it was that decision that first called into question the validity of the underlying criminal conviction.  D'Ambrosio argues the claim did not accrue until January 23, 2012, when the Supreme Court

---

[3]The parties agree that the applicable statute of limitations is two years.

denied certiorari from the Sixth Circuit's affirmance of Judge O'Malley's March 3, 2010 order barring any attempt by the State to reprosecute D'Ambrosio, because it was that denial that finally terminated the criminal conviction in D'Ambrosio's favor.

The parties agree that the resolution of when the statute of limitations began to run—and hence when it expired—turns on the application of the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), but they disagree on what conclusion to draw from that case.

The essential holding of *Heck* is that a § 1983 claim that seeks damages for an unconstitutional conviction is not cognizable (*i.e.*, it cannot be brought) unless the underlying criminal conviction has been terminated in favor of the plaintiff. Accordingly, the Supreme Court upheld the dismissal of Heck's § 1983 case because his criminal conviction had been affirmed on appeal and he had lost his habeas challenges. The Supreme Court cited the "strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction[s]" and held that "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to Section 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement. . . ." 512 U.S. at 484-86 (citation and internal quotation marks omitted).

The Supreme Court in *Heck* went on to state: "We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into

-8-

question by a federal court's issuance of a writ of habeas corpus. . . ." *Id*. at 486-87. *Heck* was not a statute-of-limitations case, and appellate courts applying this holding to cases involving the question of when § 1983 causes of action may be brought, and hence when the statute of limitations begins to run, have come to different conclusions.

This Court must, of course, start with any relevant Sixth Circuit authority. While there is no published opinion on point, the unpublished opinion in *White v. Rockafellow*, No. 98-1242, 1999 WL 283905 (6th Cir. 1999), is instructive. White, a pro se state prisoner, brought a § 1983 case against various prison officials for their role in prosecuting White for assaulting a prison guard. White was convicted by a jury, but the state court of appeals reversed the conviction in 1992 and remanded for a new trial because White had been denied the right to represent himself. White was never retried, and, on January 14, 1994, the prosecutor filed a notice of *nolle prosequi*. White filed his § 1983 case on December 30, 1996, alleging claims of malicious prosecution, denial of effective assistance of counsel, and denial of the right of self-representation. The district court dismissed the case, holding that it was filed well after the applicable three-year statute of limitations had expired. The Sixth Circuit Court of Appeals reversed. Citing *Heck*, the Court held that "[a] § 1983 claim for malicious prosecution does not accrue until the criminal proceeding is terminated in favor of the plaintiff." *Id*. at *1. Applying that rule to White, the Sixth Circuit concluded that the criminal proceeding had not terminated in White's favor until the prosecutor filed a notice of *nolle prosequi* on January 14, 1994. White's § 1983 case was, therefore, filed just barely within the three-year statute-of-limitations period, even though it was brought more than four years after the criminal conviction was reversed.

-9-

An earlier decision by the Second Circuit of Appeals applied *Heck* in the same fashion in the statute-of-limitations context. In *Diblasio v. City of New York*, 102 F.3d 654 (2d Cir. 1996), Diblasio was initially convicted by a jury of drug trafficking and possession of a controlled substance. In 1990, Diblasio obtained a writ of habeas corpus based on a claim that the prosecution's failure to produce or identify a confidential informant deprived him of a fair trial. That judgment was affirmed in 1991. Diblasio was retried and convicted, but only on the charge of unlawful possession. On January 23, 1993, Diblasio brought a § 1983 claim of malicious prosecution and unconstitutional failure to train police officers and prosecutors. The district court dismissed the claim as time-barred and for failure to state a claim. On appeal, the Second Circuit ruled the claim was <u>not</u> time-barred. The Court referred to the principle underlying *Heck* – avoiding possible conflicting judicial determinations arising out of the same transaction – and held that the cause of action did not accrue when the district judge granted the writ, notwithstanding the "impugned by the grant of a writ of habeas corpus" language in *Heck*, 512 U.S. at 658, a phrase Defendants in this case rely upon to support their position. The Second Circuit held that the reversal of a conviction and remand for a new trial does not constitute a termination of the criminal case in the accused's favor. As a result, while Diblasio's § 1983 claim was not time-barred, it was not cognizable in the first place because he was convicted on retrial, albeit on only one of the initial charges.

While the Court of Appeals for the Tenth Circuit reached the opposite conclusion, this Court respectfully believes that decision is based upon an incorrect interpretation of *Heck* – an interpretation that could lead to absurd results. In *Smith v. Gonzalez*, 222 F.3d 1220 (10th Cir. 2000), Smith was convicted by a jury on two counts of first degree murder, and the conviction

was affirmed on appeal.  Smith then filed a habeas petition, which the district court denied.  On

March 7, 1995, however, the Tenth Circuit reversed and entered a conditional writ, finding that

the prosecution had failed to disclose several pieces of relevant material exculpatory evidence.

On retrial, the jury could not reach a unanimous verdict, and the judge declared a mistrial.  On

April 21, 1996, state prosecutors filed a *nolle prosequi*, indicating they would not prosecute

Smith further; Smith was released from prison that day.

Smith filed a § 1983 action on February 19, 1999, seeking damages for violations of his

constitutional rights.  The Tenth Circuit affirmed the district court's order dismissing the claim

as time-barred by the applicable three-year statute of limitations, holding that Smith's cause of

action accrued on March 7, 1995, when the Court of Appeals invalidated the conviction and

granted the conditional writ, and not on April 21, 1996, when the criminal case was finally

terminated in Smith's favor.

The problem with the Tenth Circuit's ruling in Smith is that it could easily engender

precisely the harm the Supreme Court warned of in *Heck*: Two conflicting resolutions arising out

of the same or identical transactions.  Suppose Smith had done what the Tenth Circuit states he

should have done: File his § 1983 case in late March 1995 after the Tenth Circuit granted the

conditional writ.  Suppose the case was litigated to conclusion, Smith prevailed, and he was

awarded damages for his unlawful conviction.  Suppose further that the state proceeded to retry

Smith and the jury convicted him in an untainted trial.  There would now be two conflicting

decisions arising out of the same transaction.  Smith would have obtained damages stemming

from an unconstitutional prosecution and wrongful conviction, yet he would stand convicted on

those same charges.  This is exactly what the Supreme Court in *Heck* sought to avoid, but it is exactly what the Tenth Circuit decision allows.[4]

Accordingly, the Court chooses to follow the Sixth Circuit's unpublished decision in *White v. Rockafellow* and holds that D'Ambrosio's § 1983 claim is not time-barred.  Defendants insist D'Ambrosio's cause of action accrued on March 24, 2006, when Judge O'Malley granted the conditional writ.  But, had D'Ambrosio filed his § 1983 claim then, and obtained a favorable judgment, there would have been multiple opportunities for conflicting decisions.  First, Judge O'Malley's judgment could have been reversed on appeal.  Had the original conviction been reinstated, D'Ambrosio would have had no § 1983 claim.  Second, the initial writ was a conditional one, so that even after the Sixth Circuit affirmed and the Supreme Court denied certiorari, the state could have retried D'Ambrosio – indeed, it was planning to do so.  It was only after Judge O'Malley held that the state could not retry D'Ambrosio, the Sixth Circuit affirmed, and the Supreme Court denied certiorari that the criminal case was finally terminated in D'Ambrosio's favor.[5]

_____

[4]Another variation on the facts in *Smith* further illustrates the problem with the Tenth Circuit's holding.  Suppose the district court had granted the writ reversing Smith's conviction, and Smith had promptly filed a § 1983 action, which he won.  In the meantime, the state appealed the habeas decision, and the Tenth Circuit reversed, reinstating Smith's conviction.  Smith would now have won a judgment in a § 1983 case that is no longer cognizable.

[5]The Court finds further support for this conclusion on page 487, footnote 8 of the *Heck* opinion, where the Supreme Court states: "If a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel state-court proceedings."  If the appropriate course of action for the federal court in § 1983 litigation is to abstain until all criminal litigation is concluded, then it makes no sense to require the litigant to file the case in the middle of this litigation, for fear the statute of limitations will run.

Accordingly, since D'Ambrosio filed his § 1983 action within two years

of when the criminal litigation finally terminated in his favor his case is not time-barred.[6]

## B.    Individual Capacity Claim Against Leo Allen

In the Second Amended Complaint, D'Ambrosio seeks damages from then-Cleveland

Police Detective Allen in his individual capacity for the following *Brady* violations Judge

O'Malley found the prosecution withheld from D'Ambrosio's criminal counsel:

> • a call from Longenecker to police, after learning about the Klann murder, to inform police that he believed Klann's death was connected to the rape case against Lewis (SAC ¶ 64);

> • the anonymous phone call Lewis made to the police asking whether Klann had his hand cut, information not publicly known – and information Lewis gave to Allen which, Plaintiff asserts, Allen "knew or would eventually know was impossible, would impeach his star witness, Espinoza, and damage the prosecution's theory of the case (SAC ¶ 65);

> •Officer Hayes and Goldstein's belief that the Klann murder did not occur at Doan Creek (SAC ¶ 66);

> •evidence that no blood was found at the scene; Klann had no shoes on when he was found; Klann was wearing no underwear; Klann's wallet was missing; Allen's handwritten notes that bloody clothes were found in Mike Keenan's garage; a now-missing tape-recorded statement of Angelo Crimi revealed another suspect; someone in the building where Lewis lived, on Saturday morning before Klann's body was found, heard somebody in the building say "Let's dump the body." (SAC ¶ 66); and

> •evidence that "Tequila night at Coconut Joe's was Thursday night" – undercutting Espinoza's testimony that the murder occurred on Friday night  (SAC ¶ 67).

In short, D'Ambrosio alleges that Detective Allen violated *Brady* because he was "privy

to," "aware of," "concealed," and/or "withheld" exculpatory evidence from D'Ambrosio (SAC

¶¶ 63, 66, 67); he failed to follow up on certain leads that would likely impeach the credibility of

---

[6]D'Ambrosio, in fact, filed this case after Judge O'Malley issued an order barring retrial but before the Sixth Circuit affirmed.  This Court stayed the § 1983 case pending appeal, and only lifted the stay when the U.S. Supreme Court denied the government's petition for a writ of certiorari.

Espinoza (SAC ¶¶ 64, 67, 68); and he was aware of evidence he knew or would eventually know was false, would impeach Espinoza, or would undercut the state's theory of the case (SAC ¶¶ 65, 66).

Defendant Allen now seeks dismissal of the *Brady* claim brought against him in his individual capacity because, as a matter of law, an investigator has no obligation, under *Brady,* to turn over material exculpatory evidence to a defendant's criminal counsel. He also contends that D'Ambrosio has failed to plead sufficient facts establishing that Allen can be held personally liable for any *Brady* violations committed by the prosecutor, and he is entitled to qualified immunity for any *Brady*-derivative violations.

Title 42, Section 1983 of the United States Code creates a cause of action for public officials who violate a person's constitutional rights while acting under color of law. *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006) (citing 42 U.S.C. § 1983). Section 1983 itself is not a source of substantive rights; it merely provides a method for vindicating federal rights elsewhere conferred. *Moldowan v. City of Warren*, 578 F.3d 351, 376 (6th Cir. 2009) (*citing Graham v. Connor*, 490 U.S. 386, 393-94 (1989), in turn citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Thus, the first inquiry in any § 1983 suit is to isolate the precise constitutional violation the defendant is alleged to have committed. *Id.* (*citing Baker v. McCollan*, 443 U.S. at 140). The suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, or can be used to impeach adverse witnesses. *Moldowan*, 578 F.3d at 376-77 (*citing Brady*, 373 U.S. at 87, and *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

At the same time, public officials performing their official duties are protected from civil liability "insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (*quoting Harlow*, 457 U.S. at 806)); *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine at the pleading stage whether a defendant is entitled to qualified immunity, the court must determine (1) whether the factual allegations make out the violation of a constitutional right, and (2) whether the constitutional right at issue was clearly established at the time of defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The constitutional right must be "so clearly established at the time in question that a reasonable person in the defendant's position would have known that he was violating the plaintiff's constitutional rights." *Gregory*, 444 F.3d at 745. Once the qualified immunity defense is raised, the plaintiff bears the burden of showing that the defense does not apply. For the reasons that follow, the Court finds that D'Ambrosio has failed to plead sufficiently plausible facts demonstrating that Detective Allen violated his constitutional due-process rights.

### 1. *Brady* violation

D'Ambrosio alleges that Detective Allen violated *Brady* by withholding exculpatory evidence from D'Ambrosio's criminal counsel. (SAC ¶ 63 ("he concealed such evidence from the defense"); ¶ 91 ("Allen failed to disclose exculpatory evidence to D'Ambrosio prior to, during, and after his trial.") However, the Court recently held in the instant case that the *Brady* obligation to provide exculpatory or impeachment evidence to the defense applies only to prosecutors. (See Doc #: 48, at 7-8 (*citing Brady*, 373 U.S. at 87-88; *Giglio*, 405 U.S. at 154; *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (the *Brady* disclosure obligation extends to exculpatory evidence known only to police officers, but the responsibility for obtaining and disclosing the evidence remains the duty of the prosecutor); *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (*Brady* "applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and whether the accused asked for it or not); *Lindsay v. Bogle*, 92 F. App'x. 165, 170 (6th Cir. 2004) (a police chief's refusal to give an arrestee his internal investigation file did not violate *Brady*, even if it contained exculpatory material, because *Brady* applies to prosecutors). "To the extent that *Brady* imposes an obligation on the state to disclose exculpatory evidence to the defense, courts consistently have determined that this duty falls squarely on the prosecutor, not the police." *Moldowan*, 578 F.3d at 377. Accordingly, the Court concludes, as a matter of law, that Detective Allen had no duty under *Brady* to turn exculpatory evidence over to D'Ambrosio's criminal counsel.

## 2. *Brady*-derivative violation

D'Ambrosio contends that police officers violate due process when concealing exculpatory evidence in bad faith. (Opp. Br. at 2 (*citing Moldowan*, 578 F.3d at 402).) Here, D'Ambrosio is referring to the "concomitant or derivative duty" of a police officer, under *Brady*, to turn material exculpatory evidence over <u>to the prosecutor</u>. *See Moldowan*, 578 F.3d at 376-82 (emphasis added). The Sixth Circuit has held that the exculpatory value of the evidence must be "apparent" to the officer. *Id.* at 388 (*citing California v. Trombetta*, 467 U.S. 479, 489 (1984)). This additional burden reflects the fact that "materiality is a legal question that the police are not trained to make, and thereby accounts for the practical concern that the police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence." *Id.* (*citing Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). The reason a showing of bad faith is not required is that, where the police have in their possession evidence they know or should know is exculpatory, the concealment of that evidence can never be done in good faith. *Id.* Thus, requiring a criminal defendant or § 1983 plaintiff to show a conscious or calculated effort to suppress such evidence would be superfluous. *Id.*

D'Ambrosio alleges that Detective Allen was "privy to," "aware of," and "concealed" from the prosecutor the laundry list of evidence that Judge O'Malley determined, in the habeas case, the prosecutor withheld from D'Ambrosio. According to D'Ambrosio,

> [t]hese are the sort of specific factual allegations that satisfy *Ashcoft v. Iqbal*, 556 U.S. 662 (2009). D'Ambrosio has not provided merely conclusory allegations that Allen "withheld evidence" – D'Ambrosio has described that evidence. And D'Ambrosio has not alleged that Allen was merely "aware of" the exculpatory evidence (Allen Br. at 9) – D'Ambrosio has stated that Allen knowingly concealed it because it contradicted the prosecution's story of the murder.

(Opp. at 6.)

While the Court must accept well-pleaded factual allegations as true, it is not bound to accept as true a legal conclusion couched as a factual allegation.  *Simpson*, 2009 WL 2591682, at *1; *Twombly*, 550 U.S. at 555.  The assertion that Detective Allen "concealed" exculpatory evidence from the prosecutor is an example of a legal conclusion couched as a factual allegation.  And the argument that Detective Allen "knowingly" concealed the evidence because it contradicted the state's theory of the murder does not add any factual support to the conclusory assertion that he simply concealed it.  Presumably, if he concealed the evidence, he did it knowingly.

Indeed, the only reference to specific evidence that Detective Allen failed to deliver to the prosecutor occurs in the second sentence of Paragraph 68, which alleges:

> [i]t is further *believed*, based on differences between the police file and prosecutor's file, that Allen even withheld documents from the prosecutor's office that could be revealed to the defense.

(SAC ¶ 68 (emphasis added).)  This attempt to provide factual support for the proposition that Detective Allen withheld exculpatory evidence from the prosecutor fails as well.  By its very nature, the allegation is based upon speculation, i.e., a "belief."  Moreover, the assertion that there were differences between what was found in the police file and what was found in the prosecutor's file does not support the conclusory assertion that Detective Allen withheld material exculpatory evidence from the prosecutor.  The Court also notes that, in the Second Amended Complaint, D'Ambrosio mentions the location of the prosecutor's file and the police department file.  (See SAC ¶ 17 n.1.)  Apparently, they are exhibits attached to a memorandum in support of a summary judgment motion filed in 2003 in Judge O'Malley's habeas case.  (Id.)  However, D'Ambrosio does not bother to explain what the discrepancy between the files was; he does not

-18-

identify any material exculpatory piece of evidence in the police file that was not in the prosecutor's file; he fails to identify a specific document or other evidence that Allen withheld; and he fails to explain why such evidence would have been understood at that time by Allen to be exculpatory.

D'Ambrosio not only insists his conclusory allegations that Detective Allen withheld exculpatory evidence are sufficient to withstand *Iqbal* review, but explains that "Allen will have the opportunity <u>after discovery</u> to defend against" D'Ambrosio's allegations – including through proof that he turned the alleged exculpatory evidence over to the prosecutors. (Opp. at 7 (emphasis added).) This is an argument that turns the Rule 12(b)(6) burden of proof on its head.

Under *Iqbal*, the plaintiff bears the burden to plead specific facts that, if proven, would establish a legal entitlement to relief. 566 U.S. at 678. Although the court must accept well-pleaded factual allegations of the complaint as true, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Simpson*, 2009 WL 2591682, at *1; *Twombly*, 550 U.S. at 555. The Supreme Court has explained that this obligation to satisfy the initial pleading burden is particularly important in qualified immunity cases, given that the "basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation." *Iqbal*, 556 U.S. at 686. Thus, it is insufficient for D'Ambrosio to respond to a motion to dismiss by arguing that Allen will have the opportunity after discovery to defend himself against D'Ambrosio's unspecific, conclusory allegations. Indeed, the Court rejected a similar argument when it granted Dr. Balraj's motion to dismiss in October.[7]

---

[7]In his opposition to the motion for judgment on the pleadings against Dr. Balraj, D'Ambrosio argued: (continued on next page)

D'Ambrosio, in an effort to meet the *Iqbal* test, cites *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 281 (6th Cir. 2010), to support his contention that, prior to discovery, the Court may reasonably infer that Detective Allen concealed exculpatory evidence from the prosecutor. This argument assumes that, in this case, it is reasonable for the Court to infer that Detective Allen concealed from the prosecutor the exculpatory evidence Judge O'Malley found, in the habeas proceeding, that the prosecutor withheld from D'Ambrosio. D'Ambrosio, however, supplies no facts which would justify the Court in making this inference.

Finally, D'Ambrosio 's allegation that Detective Allen failed to follow up and conduct further investigation of certain facts, as alleged in paragraphs 64, 67 and 68 of the Second Amended Complaint, is insufficient to state a *Brady* claim. As the Sixth Circuit has held, "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010); *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Furthermore, due process is not triggered by the lack of due care by government officials; therefore, where a government official is merely negligent in causing an injury, no procedure for compensation is constitutionally required. *Moldowan*, at 382-83.

---

As indicated by the complicated back history of this case, and the documented, judicially established pattern of malfeasance and bad faith by the Cuyahoga County Prosecutor's Office, the facts as to who did what to which evidence remain clouded. Judgment on the pleadings is inappropriate because the pleadings at this stage of such a complex and important case cannot resolve the issues themselves. This case calls for an adversary procedure to ferret out the truth, not a premature dismissal that further occludes it.

(Doc #: 43, at 4.)

Coupled with the lack of factual support for D'Ambrosio's allegations that Detective Allen concealed exculpatory evidence, is the exaggeration of the exculpatory nature of the evidence that Detective Allen supposedly withheld. D'Ambrosio cannot meet the *Brady*-derivative standard that the exculpatory value of the evidence would have been apparent to Detective Allen at the time he supposedly withheld it.

The most significant exculpatory evidence that the prosecutor withheld from D'Ambrosio's defense team was the connection between Paul Lewis and murder victim Tony Klann, and Lewis' own motive for killing Klann. Klann, who was Longenecker's roommate, lived in the same building as Lewis and was a potential witness against Lewis, who was charged with raping Longenecker. D'Ambrosio now alleges that Detective Allen withheld the connection between Lewis, Klann and Longenecker's rape case from the prosecutor. In the habeas proceeding, however, Judge O'Malley rejected the warden's argument that, at the time of D'Ambrosio's trial, Prosecutor Marino was unaware of the connection between Lewis and Klann, and could not have known it was Klann who was the potential witness against Lewis in Longenecker's rape case. *See D'Ambrosio I*, 2006 WL 1169926, at *20-22. Judge O'Malley expressly found that Marino was aware of the rape charges against Lewis; Marino was in fact aware of Klann's involvement in the Longenecker rape; and Marino had aggressively dissuaded co-defendant Michael Keenan's counsel from pursuing a connection between the two cases because the connection was "weak." *Id*. Accordingly, Marino's failure to turn this evidence over to D'Ambrosio cannot be attributed to Allen not telling him about it.

As well, D'Ambrosio lists among the material exculpatory evidence Detective Allen allegedly concealed, the fact that bloody clothes were found in Michael Keenan's garage after

the murder. But Judge O'Malley held that D'Ambrosio failed to demonstrate that the bloody clothing in Keenan's garage was exculpatory. *D'Ambrosio I*, 2006 WL 1169926, at \*22-23; *D'Ambrosio*, 527 F.3d 489, 494 n.2 (6th Cir. 2008).

D'Ambrosio asserts that Detective Allen suppressed evidence that the altercation Espinoza testified occurred on Friday night, in fact occurred on Thursday night. Judge O'Malley found, however, that a police department log which was produced at trial showed that the disturbance which Espinoza testified occurred at Coconut Joe's on Friday night, in fact occurred on Thursday night. *D'Ambrosio I*, 2006 WL 1169926, at \*28.

D'Ambrosio asserts that Detective Allen concealed a tape recording of Angelo Crimi implicating "others" in Klann's murder. However, at D'Ambrosio's habeas hearing, there was evidence of a police report which stated that the tape existed but police department employees testified that when they looked for the tape, they found that all the physical evidence from the D'Ambrosio file had been signed out by Prosecutor Marino in 1988.

In short, because the allegations of the Second Amended Complaint fail to contain any specific facts which, if proven, would show that Detective Allen concealed or withheld from the prosecutor evidence he knew was exculpatory, the Court **GRANTS** the motion to dismiss the § 1983 claim against Detective Allen in his individual capacity.

### C. Official Capacity Claim Against the City

D'Ambrosio also brings his *Brady* claim against Detective Allen in his official capacity. Courts construe claims against public officials in their official capacities as claims against the political subdivision; here, the City of Cleveland ("the City"). *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 422 (6th Cir. 2007) (citations omitted). D'Ambrosio asserts that, as a policymaker

on behalf of the City, Detective Allen's alleged *Brady*-based due process violations constituted a policy, custom or practice of the City, giving rise to a *Monell* claim.

In *Monell v. Department of Soc. Servs.*, the Supreme Court held that a municipality may be held liable under § 1983 for the unconstitutional acts of its employees if either a municipality's official policy or one of its customs is the source of the injury. 436 U.S. 658, 694 (1978). Since it is a prerequisuite to *Monell* liability that the plaintiff prove an underlying constitutional violation by an employee, and since the Court is dismissing the claim against Detective Allen, the Monell claim against the City must be dismissed as well. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

**D. Individual- and Official-Capacity Claims Against the Prosecutors and County**

In Count One, D'Ambrosio asserts a § 1983 claim against Carmen Marino and William Mason in their official capacities and against Cuyahoga County. The Court first notes that, in contrast to the express factual allegations asserted against Marino in the Second Amended Complaint, there are no specific factual allegations implicating Mason in Marino's *Brady* violations. There is no allegation that Mason was an assistant county prosecutor working with Marino on D'Ambrosio's trial. There is no allegation that Mason, who became Cuyahoga County Prosecutor in 1999, had any involvement in the 2009 coverup. The Court conducted an independent review of the record and the federal habeas opinions for any specific reference to William Mason. The only explicit mention of Mason's name appears in *D'Ambrosio II*, 619 F.Supp.2d at 441 n.12 (reflecting Assistant County Prosecutor Meyer's testimony that, once he found envelopes containing soil samples, he contacted Prosecutor Mason for advice on how to proceed). Finally, there is nothing in D'Ambrosio's opposition brief describing anything

specific that Mason did.  In sum, since the Second Amended Complaint contains no specific factual allegations against Mason, the claim asserted against him in Count One is **dismissed with prejudice**.

Next, the Court must dispense with an issue—sovereign immunity—that has needlessly consumed the parties.  To the extent the claims against Marino and Mason are official-capacity suits for their acts as prosecutors in prosecuting D'Ambrosio, the claims are barred by the Eleventh Amendment.  Official-capacity suits are treated as suits against the entity for which the officer is an agent.  *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) (*citing Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  When local prosecutors are prosecuting state criminal charges, they are acting as state agents enforcing state law and policy.  *Id.*; *see also* O.R.C. § 309.08(A) (giving county prosecutors the authority to "prosecute, on behalf of the state, all complaint, suits, and controversies in which the state is a party").  Thus, an official-capacity suit against state agents prosecuting state criminal charges is treated as a suit against the state. *Pusey*, 11 F.3d at 658.  And, of course, the Eleventh Amendment bars suits for monetary damages brought by private parties in federal court against states without their consent.  *Hans v. Louisiana*, 134 U.S. 1, 17 (1890).[8]  Likewise, to the extent the claim is based on *Brady* violations that Marino and Mason committed as prosecutors, (See Doc. # 20 ¶ 81), they are absolutely immune.  *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).  That being said, the Court now turns to the allegations of Count One that relate to *Monell* liability.

---

[8]Suits against states are also barred because states are not "persons"—and therefore not suable—under § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983").

D'Ambrosio avers that Marino and Mason, during the relevant time period, "created and maintained an official policy, practice, and/or custom of ordering and compelling other prosecutors in the office to proceed with and maintain the investigation and prosecution of D'Ambrosio without concern for his constitutional rights." (Doc. # 20 at 26–27.) This claim – a *Monell* claim – is premised on the notion that Marino and Mason were acting as "the final and official policymakers for the Prosecutor's Office and Cuyahoga County." (Doc. # 20 at 26.)

They were not. At the time of D'Ambrosio's trial, Marino and Mason were *Assistant* County Prosecutors. D'Ambrosio acknowledges as much in his Second Amended Complaint. (Id. at 3.) *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (holding that the County could be liable under *Monell* for the decision of its County Prosecutor (but not for the decisions of the subordinate Assistant Prosecutors) because he possessed final authority to establish municipal policy). D'Ambrosio has not pled any facts showing that an Assistant Cuyahoga County Prosecutor possessed final decision-making authority in 1989. Marino and Mason therefore were not policymakers during the relevant time period.

D'Ambrosio further alleges the County was deliberately indifferent to the need to train, monitor, and supervise prosecutors. As the Supreme Court held in *Connick v. Thompson*, 131 S. Ct. 1350, 1356 (2011), a deliberate indifference claim may not based on a single *Brady* violation; a plaintiff must show a pattern of violations that puts the policymaker on notice.

In an effort to show a pattern of violations, D'Ambrosio lists, in paragraph 78 of the Second Amended Complaint, a series of cases showing that Marino "has a shameful record of breaking rules to win convictions." (Doc. # 20 at 25-26.) But those cases do not help D'Ambrosio. First of all, any misconduct that occurred after D'Ambrosio's trial is irrelevant. In

*Connick*, the Supreme Court ruled that "contemporaneous or subsequent conduct cannot establish a pattern of violations," and thus give rise to *Monell* liability, because that conduct would not provide notice to the local governmental entity and allow it to conform to constitutional dictates. (Citation and internal quotation marks omitted).

And as to the three cases of Marino's misconduct that occurred *before* D'Ambrosio's trial, they are also irrelevant, because they did not involve *Brady* violations.[9]  In *Connick*, the Supreme Court held that a failure-to-train theory requires the plaintiff to show a pattern of *similar* constitutional violations by prosecutors.  The plaintiff, who had been wrongfully convicted, sentenced to death, and ultimately set free after his convictions were vacated, sued the district attorney for failing to properly train his prosecutors about their duty to produce exculpatory evidence.  The plaintiff had shown that, during the ten years preceding his tainted trial, the state courts had overturned four conviction because of *Brady* violations committed by the district attorney's prosecutors.  But even those earlier violations were not similar enough to establish a pattern of misconduct that would put the district attorney on notice because none of those earlier cases involved the specific type of *Brady* violation at issue in the instant case: Failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.  If numerous but different *Brady* violations are not enough to establish a pattern of misconduct, then, *a fortiori*, numerous non-*Brady* violations also cannot establish such a pattern.[10]

---

[9]References in D'Ambrosio's opposition brief to Mahoney's testimony is similarly unavailing, as that testimony does not concern Brady violations but instead refers to production issues in habeas proceedings almost 20 years after D'Ambrosio's trial.

[10]In fact, only one of the cases cited by D'Ambrosio in his Second Amended Complaint refers to a *Brady* violation, but that violation was not recognized by a court until 2003, 14 years

The only case D'Ambrosio cites in support of his *Monell* claim is *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 712 (S.D.N.Y. 2012). In that case, the court denied a motion to dismiss the *Monell* claim against a prosecutor's office where the plaintiffs cited numerous cases in which prosecutors from the office committed misconduct. That case, however, is readily distinguishable. First, it concerned allegations of very recent misconduct. In addition, the plaintiffs pointed to more than fifteen reported cases highlighting similar misconduct, alleged the existence of several unreported cases involving misconduct, and alleged the existence of a long-standing policy of failing to discipline prosecutors who committed specific types of prosecutorial misconduct. These crucial facts are not alleged in this case.

Finally, D'Ambrosio claims Marino had a policy of either allowing defense counsel to review police reports and take notes but not to make copies of the reports or reading the reports to defense counsel but not showing the reports to them. As noted above, Marino was not a final policymaker, so his conduct is not actionable under *Monell*. But even if he was a policymaker, what he did is not a *Brady* violation, unless there is evidence that Marino actually withheld material exculpatory evidence in the reports. There is no such allegation.

The only facts D'Ambrosio alleges in the Second Amended Complaint are the constitutional violations Marino committed in the 1989 trial. The rest of the complaint consists of nothing more than conclusory allegations about a pattern of misconduct. Under the combined force of *Iqbal* and *Connick*, D'Ambrosio fails to state a claim for *Monell* liability against the County.

---

after the D'Ambrosio trial. *State v. Larkins*, 2003 Ohio 5928 (Ohio Ct. App. Nov. 6, 2003).

**IV.**

No one should construe the  conclusions of law the Court has reached in dismissing

D'Ambrosio's § 1983 claims as a judicial endorsement of the conduct of the Cuyahoga County

Prosecutor's Office during D'Ambrosio's 1989 trial.  That conduct has been described in critical

and painstaking detail by my colleague, Judge O'Malley, and by two decisions of the Court of

Appeals for the Sixth Circuit.  Suffice it to say, those opinions recount how Defendant Carmen

Marino trampled upon D'Ambrosio's constitutional rights.

Because so much of what a prosecutor does must remain confidential, both to avoid

compromising sensitive investigations and to protect the innocent, our system depends upon men

and women of character and integrity who understand that the awesome power of the job comes

with the responsibility to support and uphold the constitutional rights of the accused, no matter

how heinous the crime he is alleged to have committed.

The doctrine of absolute prosecutorial immunity is necessary because without it, men and

women of character and integrity would be less willing to serve as prosecutors at the state or

federal level, and/or might be adversely impacted in making the difficult decisions the position

requires.  The strict requirements Supreme Court in *Connick* placed upon plaintiffs who would

seek to establish *Monell* failure-to-train liability upon local governments were similarly

established to avoid imposing crippling financial liability upon those governments for the errors

of assistant prosecutors.[11]

---

[11]While all this may seem cold comfort to D'Ambrosio, a § 1983 lawsuit is not his sole
remedy.  The Court observes that, just recently, a state court judge cleared the way for
D'Ambrosio to collect up to one million dollars from a State of Ohio compensation fund for the 21
years he spent in prison.

Accordingly, for the foregoing reasons, the Court **GRANTS** the pending Motions (Doc ##: 51, 52 and 53) and dismisses the claims with prejudice.

**IT IS SO ORDERED.**


       _/s/ Dan A. Polster    January 23, 2013_
**Dan Aaron Polster**
**United States District Judge**